UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA – TAMPA DIVISION

GENERATION Z EDUCATIONAL HOLDINGS, INC.,

        Plaintiff

v.                                                                                    No. 8:14-cv-00203-VMC-MAP

LANGUAMETRICS, INC. fka LANGUAMETRICS, LLC.,

        Defendant

_____/

## DEFENDANT'S RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION

Comes now defendant, through counsel, and files this response to the motion for preliminary injunction (Doc. 2). The motion is not honest and borders on the frivolous. A simple reading of Dumont's emails (Ex. 4 here) will show this.

## FACTS BEHIND THIS LAW SUIT

*UnderlyingFacts:* The facts set forth here are found in the declarations of Spiegel and Wang, attached here as Exhibits 2 and 3. Kenneth Spiegel, a Tampa resident, is the CEO and founder of LanguaMetrics, Inc. LanguaMetrics creates computerized English language speech testing for non-English-speaking students who wish to measure and improve their spoken English. In 2012 declarant Dumont and his boss Barry O'Callaghan introduced Spiegel to Paul Wang and Wang's associates in China. Spiegel Dec. Ex 2, par. 3. Dumont works for O'Callaghan in O'Callaghan's educational business known as EMPGI/Daplon and other entities. Wang is a Chinese national involved in educational businesses in China. Wang and O'Callaghan were joint shareholders and had a series of entities primarily in the Chinese education market, generically referred to as the Rise Entities. Spiegel Dec. Ex. 2, at pars. 3, 6; Wang Dec. Ex. 3, pars. 2 – 4.

Spiegel's role at the joint behest of Dumont/O'Callaghan and Wang was to begin working in the Chinese market with the personnel that Dumont/O'Callaghan introduced him to. These were primarily contacts of Mr. Wang in China. At all times Dumont and everybody involved knew Spiegel was working in China with the Wang contacts. Spiegel Dec. at pars 4, 6. Wang at this time (2012 – 2013) was a partner with O'Callaghan/Dumont in the Chinese educational market. Wang and his associate Justin Cahill negotiated with Spiegel the agreement with Generation Z that is attached to the complaint. Generation Z was a United States company affiliated with the Rise entities and with Callaghan. Ex.1; Spiegel Dec. at pars. 3, 4; Wang Dec. at pars. 2 – 5.

Only Chinese companies controlled by Chinese citizens may operate in the education market in China. Spiegel Dec. , Ex. 2  at pars. 2, 5; Wang Dec. at par. 4. It was the joint plan of Wang/Cahill and Dumont/O'Callaghan to form a "Newco" for this business in the Chinese market. Spiegel Dec. at par. 6; Wang Dec. at par. 6.  This "Newco" would be a domestic Chinese company, as required by Chinese law.

The economic concept here from beginning to end was between LanguaMetrics and Wang/Cahill. Dumont was mainly in the U.S. businesses and handled contractual negotiations for O'Callaghan. Spiegel Dec. at par. 6. Each person understood that Generation Z was not an operating , ongoing company, and had no business, nor intent or capability of doing business in China. It was simply used as a vehicle to pay the $100,000 payment, as it would take too long to get the payment directly out of China. Spiegel Dec. at par. 6; Wang Dec. at par. 6. The joint plan was for LanguaMetrics to work with a new Chinese entity, which Dumont called  "Newco" in his emails (Ex. 4 here)  It was also anticipated during late 2012 to early 2013 that Dumont/O'Callaghan would negotiate an investment and part ownership in LanguaMetrics. Spiegel Dec. at  pars. 6,  8;Wang Dec. at pars. 6,  8.

During the entire time since late 2012 until now, Spiegel for LanguaMetrics has been working in the Chinese market with the same people. Dumont and all persons knew this. Spiegel Dec. at par. 8, 10; Wang Dec. at par. 11. The Dumont emails (Ex. 4) show he knew and encouraged this work, and those emails belie his statements otherwise. No one ever told Spiegel to stop working in China until Dumont threatened suit in January, 2014. Spiegel Dec. at pars. 7, 8, 12; Wang Dec. at par. 12.

By Spring 2013 it was clear that the possible investment and partial ownership of Dumont/O'Callaghan in LanguaMetrics was at impasse and would not happen. Spiegel Dec. par. 8; Wang Dec. par. 8. All parties knew that the LanguaMetrics' Chinese rights, set forth in the contract with plaintiff Generation Z, were going to be reassigned from Generation Z into a new Chinese company to be formed, "Newco." Spiegel Dec. at pars. 5, 6, 9, 10; Wang Dec. at par. 6. As shown in Dumont's emails (discussed below), Dumont had delayed accomplishing this reassignment of LanguaMetrics' rights for about 6 to 8 months during 2013, as he had other business pressing. Dumont acknowledged his delay in the October 14, 2013 email, and suggested that Paul Wang could simply reassign these LanguaMetrics rights from Generation Z to any entity whatsoever, related or unrelated. Dumont just wanted his money back, $105,000.

Dumont expressed no desire to pursue the Chinese market through LanguaMetrics or Generation Z as his emails show. Spiegel anticipated that Wang would work this routine reassignment of contracts out with Dumont/O'Callaghan, as both Wang and Dumont told Spiegel it would happen. Spiegel Dec. at pars. 7, 8; Wang Dec. at 11. *All persons* were aware of what Spiegel was doing in China, which was doing the same work with the same parties as Dumont/O'Callaghan introduced him to in 2012. Id. The emails show Dumont was not injured or surprised: he just wanted the $100,000 plus $5000 expenses after putting the issue on the back

burner for months, and all would be fine with Dumont however the rights reassignment went. What entity name and when the reassignment would occur, Spiegel left up to Wang and his partners in Rise, Dumont/O'Callaghan.  Spiegel Dec. at par. 8, 12.

In late 2013 all the businesses/assets jointly owned by O'Callaghan and Wang in China, known as the Rise Entities or Rise Global Companies,  were sold to Bain Capital for many millions. Bain now controls /operates all the former Rise China Group businesses/assets in the Chinese market.  The Bain sale agreement prohibits  Generation Z (and all O'Callaghan affiliates including the pre-sale Rise entities) from operating competing businesses to any portion of the post-sale Rise China Group in the Chinese educational market.  Wang pars. 9, 10, 13.

Plaintiff Generation Z is an entity related to Rise and to O'Callaghan.  Spiegel and Wang state this on personal knowledge, and both Dumont's declaration and the complaint state that Rise and Generation Z are related.  Spiegel Dec. at par. 9; Wang Dec. at 9.  The filings by this plaintiff attached here in Exhibit 1 show Generation Z to be affiliated with the pre-sale Rise and O'Callaghan.   Generation Z is precluded by the Bain sale from any competing educational testing business in China because it is an affiliate of Rise, O'Callaghan, and his interests.   Wang Dec. pars. 9, 10.   As noted by Wang in his declaration, however, Metrics China (what Spiegel anticipated to be the ultimate assignee "Newco,") is specifically carved out and expressly excluded from the Bain non-compete.  Wang par. 13.  Metrics China is free to use LanguaMetrics' services in China.  Generation Z, O'Callaghan affiliates, and its related EMPGI/Rise entities are simply barred from using LanguaMetrics' services in China after the sale of Rise businesses/assets to Bain.  Wang Dec. at pars. 9, 10, 13.

What caused this lawsuit (and the new-found feigned "alarm" by Dumont) is that, unbeknownst to LanguaMetrics/Spiegel, Mr. O'Callaghan and Mr. Wang – two very large

businessmen -- have gotten into a much larger dispute over many subjects.   Spiegel Dec. at par. 9; Wang Dec at par. 12.   Last year in email  Dumont offered to assign the LanguaMetrics Chinese rights for $105,000, after stating he was too busy and delayed the issue for 6 plus months and would like it "tidied up." Now the issue  is floridly depicted as a newly-discovered ongoing usurpation, "with each passing moment" (Mot. at 3, Doc. 2) when in truth this injunction is really just a tactic for leverage by O'Callaghan against Wang.

**Dumont emails (Ex. 4) show the facts:** The Dumont emails contradict his declaration, and are consistent with the Spiegel and Wang declarations.  The emails show Dumont was aware Spiegel was in China working on LanguaMetrics-related education business.  For example, on February 6, 2013 Dumont told Cahill that the cost of the "simple assignment agreement" for the assignment of the LanguaMetrics rights was going to be $130,000, and Dumont would like it paid to Dumont, thinking Paul Wang "would have to pay it from his own pocket."  This email makes clear that LanguaMetrics' rights were going to be assigned by Dumont, not worked by Generation Z as a "first mover" in China.  Cahill in China complains about the $30,000 extra cost for the reassignment consent, and Dumont says Dumont "will handle the written consent…I am constrained as of 2-22 and could use, at a min the payment on the $100k back."  The email from Cahill to Dumont  -- who were then joint venturers -- says the expected new company as assignee of LanguaMetrics' rights will be Hong Kong based.

On March 8, 2013 Spiegel copied Dumont on an email stating," I got a call from RISE in Beijing [Mr. Wang's people] and they need me there for a big deal with Sichuan province and Xinhua media...." Dumont responded 25 minutes later to Spiegel, "That is certainly exciting."  Five days later Spiegel copied Dumont on an email: "All is going well here in China, thanks."

Dumont and Spiegel discussed that Spiegel was working on the Chinese educational products in China during 2013. Ex. 4.

Also during the March 2013 time frame the investment that Dumont/O'Callaghan wanted to make in LanguaMetrics reached impasse. In this vein Dumont's email of March 9, 2013 states,

> "if we cannot come to terms that you are happy with, for the right reasons, we will together decide that it will not be a good idea....At a min. we will have to consider the funds paid to date and see how to treat them, we did all in good faith, as you have....In the interim, I have asked our attorneys[drafting the proposed investment] to stand down....I wish you safe travels and good luck in China."

In this email, almost one year ago, Dumont wishes Spiegel good luck working in China, and told Spiegel he was acting in good faith and we will have to "see how to treat" the $100,000, "the funds paid to date."

On that same date, March 9, 2013, Dumont emailed Wang (cc: O'Callaghan) and stated that Dumont/O'Callaghan's planned investment in LanguaMetrics had hit impasse. Dumont said Spiegel had told Dumont that Wang had called Spiegel to China to work on "a big deal with Xinhua media in Sichuan province." Dumont said he had steered clear of the developments in China, but Dumont said Spiegel informed Dumont of "some new employees of the proposed Newco and potential transfer of the leads on the Test project out of Rise." This Dumont email (in Ex. 4) proves that as of March 9, 2013 Spiegel was informing Dumont what was going on in China, including finding new employees for "Newco" and potential transfer of leads on the Test out of the Rise joint venture.

Dumont then got busy with unrelated business matters. Dumont dropped the LanguaMetrics reassignment issue for over seven months. During this time, Spiegel continued to work as he had told Dumont, and as everyone knew, with the same people in China. Later, on October 14,

2013 Dumont sent an email admitting to being occupied with other things. Dumont admitted that he delayed for months addressing the reassignment of the LanguaMetrics rights from Generation Z. Dumont first offered Wang and Cahill congratulations on the Bain closing. Then Dumont said:

> "Given the challenges that [the sale to Bain] and the previous process presented at the EMPGI [O'Callaghan's company] and Rise [joint venture Wang/O'Callaghan] level, I had elected not to muddy the waters over the last 6-months regarding LanguaMetrics. That said, as the culmination of the proposed transactions nears closure, I was hoping to get things tidied up between Generation Z over here and the states and whatever entity you wish to have the rights around pursuit of ELL [English Language Learning] Assessment.....Pay Gen Z, my legal entity here in the states $105,000 to assign LM [LanguaMetrics] rights over to whatever entity you would like....I had previously discussed this with Ken several months ago and he was in agreement and had no issue with the assignment." Ex. 4. (emphasis in emails added).

Most importantly, Dumont said in this email, "we only need Ken's [Spiegel's] signature because the assignment would be to an entity that is legally of no relation to Gen Z."

After the October 14, 2013 email from Dumont, Spiegel continued to work in good faith. He expected this reassignment issue of the LanguaMetrics contract would be settled amicably between Wang and O'Callaghan on either side of him, as Dumont assured it could be. Spiegel Dec. pars. 8, 12. Spiegel received assurances from Wang as late as December, 2013 that resolution of the matter was under way. Specifically Wang told Spiegel that Wang tried to telephone O'Callaghan about this matter twice, but O'Callaghan had not returned his calls. Spiegel Dec. par. 12.

The facts show two main points. First, Generation Z (as well as O'Callaghan and any affiliate such as the pre-sale Rise entities) are entirely barred from this market due to the noncompetition covenants entered into as part of the sale of the Rise China businesses and assets to Bain. Second, Dumont's emails (especially 3/9/13 and 10/14/13) betray the "first mover" fable. They show Dumont claimed no alacrity, no injury, and Dumont knew Spiegel/LanguaMetrics was

working with Wang and the anticipated "Newco" in China.  On October 14, 2013 Dumont conceded he had delayed for months this reassignment of rights matter.  The 10/14/13 email shows Dumont was without any thought or care who -- any unrelated party -- would get the LanguaMetrics rights.  Dumont just asked for his $100,000 plus expenses (now $5000) back after Dumont himself had delayed it for months.

Dumont's emails in Exhibit 4 show that he had no plan for Generation Z to directly enter the Chinese market nor could it under Chinese law or under the Bain contracts. To quote Dumont, he just wanted "to get things tidied up" and get a cash payment.   Dumont made clear in his 10/14/13 email that the LanguaMetrics rights could be assigned by Wang to any unrelated entity "of your choosing."

## ARGUMENT AND MEMORANDUM OF LAW

This Court is well aware of the legal hurdles plaintiff must bear, and we do not belabor or recite the hornbook quotes here.  *See generally, GPS Industries, Llc. v. Lewis,* 691 F.Supp2d 1327, 1332 (M.D. Fla. 2010)(Pizzo, J., denying injunction).  Plaintiff has failed to prove any of the elements it must prove:  actual and imminent irreparable harm, no adequate remedy at law, likelihood of success on the merits, balance of hardships, and assessment of the public interest.

### *Actual and Imminent Irreparable Harm - A Frivolous Contention*

Dumont feigns in his declaration and in the complaint that he just noticed this imminent and irreparable surreptitious usurpation of plaintiff's rights to be "first mover" in China.  This is disingenuous and frivolous. (See Dumont dec. at par. 2 "it has come to my attention..."; " motion at 4 – 5, Doc 2:  "it recently has come to light…"  "As soon as Mr. Dumont learned…." …"with each passing moment…" Mot. at 3, Doc. 2).

Dumont's emails put the lie to these contentions. Dumont himself delayed for seven months "tidying up" the reassignment of LanguaMetrics' Chinese rights due to the press of Dumont's business. Then Dumont said those LanguaMetrics contract rights could be assigned to anybody unrelated, he did not care, but please pay him $105,000. (Ex. 4 10/14/13). This happened throughout 2013: no alarm, no alacrity, no cry of imminent injury or "robbery." There is a reason Dumont and this motion do not discuss emails.

Generation Z Educational Holdings Inc., and its non-Chinese and Callaghan/Rise affiliates are flatly barred from competing for "first mover" status  -- or any status -- in China. This bar arises from Chinese law and also the Bain sale restrictive covenants. [Plaintiff's present counsel likely negotiated those very covenants with Bain].

Moreover, Dumont's emails show he knew from 2012 and 2013 that LanguaMetrics' principal Spiegel was working in China on this business with Wang's people. "First Mover" status is therefore moot, and long gone, and no longer available - the emails show Dumont knew this well and acquiesced.  The sole cause of irreparable harm ("preserve first mover status in China!") is quite moot. Metrics China has that status as Dumont knew and permitted for nearly a year. The strong arm of equity is powerful but it cannot restore this plaintiff to a status it never had, never sought, forewent in favor of others, and is legally barred from seeking.

### *Legal Remedies Suffice*

Mr. Dumont has already told everyone in his October 14, 2013 email that a legal remedy - $105,000 paid to Dumont - is just fine and satisfies all.  If a legal remedy suffices, plaintiff's claim for injunctive relief fails. By Dumont's own words, monetary damages can compensate Dumont.  "An injury is 'irreparable' only if it cannot be undone through money damages." *GPS*

*Industries, supra,* 691 F. Supp2d at 1338 (Pizzo, J.), *citing Cunningham v. Adams,* 808 F.2d 815, 821 (11th Cir. 1987), *also cited in Pharmerica v. Eagle Healthcare, Inc.,* No. 8:11cv2017-VMC-EAJ (2011)(doc. 49, aff'd by Covington, J.); accord *Cantor Fitzgerald L.P. v. Cantor*, 724 A.2d 571, 586 (Del. Chancery 1998)("extraordinary relief" not available "if the injury can be fully compensated after a full trial on the merits, either by an award of damages or by any other form of final equitable relief").

Further, what plaintiff wants is not well-suited for equity.  As noted above, Dumont has knowingly foregone and acquiesced while Chinese "first mover" status went to another.  Although of course Mr. Spiegel and LanguaMetrics would follow the spirit and letter of any injunction,  Dumont has not sought an injunction against the Chinese citizens and Chinese entities involved in China.  Having knowingly acquiesced in foreign nationals' development of this technology in China for over a year, Dumont seeks no restraints upon those Chinese movers, and asks equity to deliver him something (restoration as "first mover" in this Chinese market) that equity cannot accomplish with certainty.  The strongest injunction in the world cannot 1) change the bar on plaintiff caused by the Bain non-competes; 2) make the American company Generation Z legal to operate in China; and 3) control the conduct of Chinese nationals in China without plaintiff even asking to enjoin them.   Plaintiff's (purported) need for this injunction asks this Court to abet plaintiff  in violating Chinese law and violating the October 2013 contracts with Bain Capital.

### *The Relative Equities/Balance of Harm Favors Defendant*

Under both Delaware and Florida law the Court must determine "that the harm to the plaintiffs if relief is denied will outweigh the harm to the defendants if relief is granted." *Bertucci's Restaurant Corp. v. New Castle County*, 836 A.2d 515, 519 (Del. Chancery 2003).

The Court must consider relief "in light of the relative hardships [upon] the parties." *Cantor Fitzgerald, L.P. v. Cantor,* 724 A.2d 571, 587 (Del. Chancery 1998); *accord, GPS Industries*, 691 F. Supp2d at 1338. Here the equities weigh heavily on the side of defendant. The emails show this plaintiff had not the slightest care how the LanguaMetrics rights were assigned, to any unrelated third party of anyone's choosing. All Dumont wanted was to "tidy the matter up" and get $105,000.

Dumont's emails make this very clear, and also establish that Generation Z had zero plans to conduct this business in China as of 2013. Moreover, neither this plaintiff nor any pre-sale Rise entity nor any O'Callaghan affiliate may now compete in China. So if the injunction is denied, plaintiff will suffer no real harm at all, although O'Callaghan will be denied leverage against Wang in his collateral disputes.

Conversely, the granting of an injunction will utterly ruin Mr. Spiegel. Spiegel Dec. par. 11. His business and livelihood will be over. He will be without work, and will have wasted a very large investment and several years of his career developing what he thought he was supposed to do.

### *Plaintiff Has No Likelihood of Success*

This plaintiff has no likelihood of success on the merits. To the contrary, an anticipated counterclaim by defendant has a much greater likelihood of succeeding. Plaintiff breached this contract through a large sale of many China-related entities to Bain Capital in October 2013. That lucrative sale rendered this plaintiff legally barred, incapable and unqualified to do *any* business in China to fulfill its duties to LanguaMetrics. Spiegel Dec. par. 9; Wang Dec. pars. 9,

10. That Bain sale was a choice made for handsome payment by principals and entities related to plaintiff. It also breached duties that plaintiff owed under the contract it now sues upon.

The contract Generation Z entered into was to begin the process of the joint venturers Wang and O'Callaghan/Dumont working with LanguaMetrics to develop an English teaching product for the Chinese market. But one of the joint venturers, the O'Callaghan/Dumont/Generation Z side, contracted in August 2013 to stay out of the Chinese market entirely by selling the Rise Chinese-related assets to Bain and barring themselves from the Chinese education market. Wang pars. 9 – 11. Generation Z has thwarted this LanguaMetrics contract to develop prototypes for the Chinese market by the sale to Bain. Generation Z and affiliates are simply barred from that market. Generation Z can offer LanguaMetrics no business in that market. Dumont's emails show Generation Z never intended to go there anyway. The facts of this case show as false, indeed a sham, the claim "Generation Z is a pioneering firm in a burgeoning but early-stage market." Mot. at 12 Doc. 2.

Moreover, the contract (sec. 1.3) expires by its terms June 30, 2014. This is a short time and a brief period unworthy of judicial injunctive labor.

Plaintiff admits that it does not present a claim under a restrictive covenant, but says the claims "are *akin* to a restrictive covenant in an employment agreement." Mot. at 10, Doc. 2 (emphasis added). The one-year noncompete portion that is part of the contract is irrelevant: Generation Z and all the related entities *cannot compete* in China under the Bain sale covenants. By definition LanguaMetrics is therefore not competing with plaintiff in "the covered territory" under that contract, which is China. The noncompete is unenforceable for this reason.

The one-year noncompete is also unenforceable for the same reasons Judge Pizzo found in *GPS Industries,* 691 F.Supp2d at 1333 – 1334. "A restrictive covenant not supported by any legitimate business interest…is unlawful and is void and unenforceable. Fla. Stat. 542.335(1)(b)." *Id.* 1333. The plaintiff in *GPS Industries*, like plaintiff here, failed to prove that it had "*substantial* relationships with *specific* prospective or existing customers or clients." *Id.* at 1334 (emphasis by Judge Pizzo). Plaintiff must put in this record real and indentifiable prospective future clients whose relationships are being injured – otherwise this is not a legitimate business interest the law will enforce. *Id.* Neither plaintiff here nor in *GPS Industries* could do so. Speculation about hoped-for future business is entirely insufficient, as the *GPS Industries* case teaches.

Plaintiff's also admits that this is not a "trade secrets" case, but says it "has *the effects* of one." Mot. at 12, Doc. 2 (emphasis added). References to "trade secrets" here are both inapt and without content.

The "trade secrets" claim is inapt because the know-how and "secrets" are all LanguaMetrics,' not plaintiffs.' *GPS Industries* shows that pre-existing knowledge and skill held by a defendant prior to hiring cannot be restrained or "bottled up" by a later employer, even with a signed non-compete. *Id.*, 691 F.Supp2d at 1335 – 1336. Moreover, as the Court held in *MDT Personnel l, Llc. v. Camoco, Llc.,* No. 8:10-cv-VMC-MAP (M.D. Fla. 2010(Pizzo, J., aff'd by Covington, J.), "misappropriation of a trade secret occurs where a person who knows or has reason to know that the trade secret was acquired by improper means acquires the trade secret *of another* or where a person who has obtained the trade secret by improper means discloses or uses the trade secret *of another* without express or implied consent." Doc. 30 at 5 (emphasis added).

The "trade secrets" claim is hollow because plaintiff had no "trade secrets" at all. Plaintiff does not proffer one actual secret of plaintiff or actual trade process of plaintiff or one actual computer program of plaintiff that defendant took.

Finally, there are fact-intensive and contested issues set forth here concerning Dumont's acquiescence and waiver. Both Delaware and Florida opinions state that these issues are not resolvable at this stage. As held by Judge Pizzo in *GPS Industries,* "enough issues of fact remain to warrant against the use of injunctive relief. Indeed, the Eleventh Circuit has cautioned courts to exercise great care before the entire case has been fully and fairly heard to assure that the power of the court to require or deter action does not result in unwarranted harm to the defendant or the public." *Id.,* 691 F.Supp2d. at 1337. *Accord*, *Cantor-Fitzgerald, supra,* 724 A.2d at 45 ("acquiescence/waiver arguments go to the merits and are factually intensive. They cannot be finally resolved at this stage in the proceedings, on the limited record before me.")

### *The Plaintiff Seeks Equity With Unclean Hands*

A plaintiff seeking the strong arm of equity must enter equity with clean hands. Dumont and his claims fail this test. "For the defendant to successfully avail itself of the doctrine of unclean hands, it must satisfy two requirements. First, the defendant must demonstrate that plaintiff's wrongdoing is directly related to the claim against which it is asserted...Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show it was personally injured by [the] conduct. *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 450 - 51 (11th Cir. 1993)(internal citations omitted). As for the first requirement, the plaintiff's misconduct must be directly related to the merits of the controversy between the parties. *Mitchell Bros. Film Grp. v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir. 1979).

Dumont's factual claims and his declaration are disingenuous, and knowingly misleading. The picture of alacrity and imminent, surreptitious injury is utterly belied by Dumont's emails. His petition before this Court is false in text and false in spirit, and is shown so by his own emails. Likewise, Dumont and his superior O'Callaghan, know that neither the related Rise entities nor plaintiff may participate in this China education market under the non-competes entered into on behalf of all affiliates with Bain Capital in October, 2013. The Court deserves better.

### *The Public Interest*

There is no public interest in granting equitable relief to a corporation who may not act on the relief. Plaintiff is unable to sell educational goods in the Chinese market under Chinese law. Nor could plaintiff or its affiliates at the former Rise or O'Callaghan companies sell these goods there without breaching the Bain contracts entered October, 2013. That O'Callaghan has a larger legal battle with Wang and desires leverage against Wang is of no public concern.

In contrast, the public interest does favor international commerce, and there is legal, ongoing commerce involving the education of Chinese students in the art of spoken English. The public interest would be injured if this commerce were aborted to give Mr. O'Callaghan leverage in his greater disputes with Mr. Wang.

### CONCLUSION

To quote Judge Covington, "there is no power…more dangerous in a doubtful case, than the issuing of an injunction." *Dandar v. Church of Scientology Flag Servs.,* 2012 WL 5878033 at *4 (M.D. Fla. 2012). Dumont's emails and the Wang and Spiegel declarations show this motion to be meritless. Since 2013 plaintiff may not conduct business in China for the reasons set forth

above. Generation Z was a payment vehicle for initial funds, in need of a delayed "tidying up," for a sum of money, to quote Dumont. The injunction means nothing to Generation Z, although it would benefit O'Callaghan. An injunction, like this entire proceeding, is a waste of judicial labor and contrary to the public interest.

CERTIFICATE OF SERVICE: I HEREBY CERTIFY that the foregoing was served this 17th day of February, 2014 to all persons participating in the ecmf filing system.

> RESPECTFULLY SUBMITTED,
> */s/ William F. Jung,* Fla. Bar No. 380040
> Jung & Sisco, P.A.
> 101 E. Kennedy Blvd., Suite 3920
> Tampa, Fl. 33602
> (813) 225-1988
> wjung@jungandsisco.com